# Operating Agreement

of

MBCI & Evercorp  LLC

Government Exhibit 8
Case 23-CR-64 Trial

TABLE OF CONTENTS

**ARTICLE 1 : FORMATION ........ 4**

Section 1.1 Certain Definitions ........ 4
Section 1.2 Formation, Amendments, and Foreign Qualification ........ 5
Section 1.3 Name ........ 6
Section 1.4 Term ........ 6
Section 1.5 Purpose ........ 6
Section 1.6 Principal Office ........ 6
Section 1.7 Registered Office and Registered Agent ........ 6

**ARTICLE 2 : MEMBERS AND MEMBERSHIP INTERESTS ........ 6**

Section 2.1 Initial Member(s) ........ 6
Section 2.2 Issuance of New Membership Interests ........ 6
Section 2.3 Nature of Membership Interest and Company Property ........ 7
Section 2.4 Withdrawal or Expulsion of Member Prohibited ........ 7
Section 2.5 Restrictions on Transfer of Interests; Right of First Refusal ........ 7
Section 2.6 Rights and Duties of Transferors and Assignees ........ 9
Section 2.7 Certificates ........ 9
Section 2.8 Representations and Warranties ........ 9

**ARTICLE 3 : MANAGEMENT OF THE COMPANY, MEETINGS, AND VOTING ........ 10**

Section 3.1 Management ........ 10
Section 3.2 Initial Manager(s); Number and Qualifications ........ 11
Section 3.3 Term ........ 11
Section 3.4 Resignation and Removal ........ 11
Section 3.5 Manager Vacancy ........ 11
Section 3.6 Officers, Employees, and Other Agents ........ 11
Section 3.7 Location of Meetings; Alternative Forms ........ 11
Section 3.8 Notice of Meetings; Waiver ........ 11
Section 3.9 Quorum and Required Vote ........ 12
Section 3.10 Action by Written Consent ........ 12
Section 3.11 Compensation ........ 12

**ARTICLE 4 : CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS ........ 12**

Section 4.1 Agreed Capital Contributions ........ 12
Section 4.2 Additional Capital Contributions ........ 13
Section 4.3 Capital Accounts ........ 13
Section 4.4 Advances ........ 13

**ARTICLE 5 : TAXATION AND ALLOCATIONS ........ 13**

Section 5.1 Allocations Generally ........ 13
Section 5.2 Tax and Regulatory Allocations ........ 13
Section 5.3 Reporting ........ 14

**ARTICLE 6 : DISTRIBUTIONS ........ 14**

Section 6.1 Distributions Generally ........ 14
Section 6.2 Optional Annual Tax Distribution ........ 14

**ARTICLE 7 : BANK ACCOUNTS, BOOKS, REPORTS, AND FISCAL YEAR ............ 14**
Section 7.1 Bank Account ............ 14
Section 7.2 Books, Records, and Other Information ............ 14
Section 7.3 Tax Classification; Tax Returns and Information ............ 14
Section 7.4 Tax Audits and the Tax Representative ............ 15
Section 7.5 Fiscal Year ............ 15
**ARTICLE 8 : DUTIES, INDEMNIFICATION, AND CONFIDENTIALITY ............ 15**
Section 8.1 Exculpation ............ 15
Section 8.2 Scope of Duties of Covered Persons; Outside Activities ............ 15
Section 8.3 Indemnification ............ 16
Section 8.4 Insurance ............ 16
Section 8.5 Duration of Protection ............ 16
Section 8.6 General Limitation of Liability of Members and Managers ............ 17
Section 8.7 Confidentiality ............ 17
**ARTICLE 9 : WINDING UP ............ 17**
Section 9.1 Events Requiring Winding Up ............ 17
Section 9.2 Revocation or Reinstatement ............ 18
Section 9.3 Winding Up Affairs and Distribution of Assets ............ 18
Section 9.4 Termination ............ 18
**ARTICLE 10 : MISCELLANEOUS PROVISIONS AND DEFINITIONS ............ 18**
Section 10.1 Notices ............ 18
Section 10.2 Entire Agreement ............ 18
Section 10.3 Amendments ............ 19
Section 10.4 Governing Law; Submission to Jurisdiction ............ 19
Section 10.5 Power of Attorney ............ 19
Section 10.6 Successors and Assigns; No Third-Party Beneficiaries ............ 19
Section 10.7 Counterparts ............ 19
Section 10.8 Construction ............ 19
Section 10.9 Severability ............ 20
Section 10.10 Waiver ............ 20
Section 10.11 Further Assurances ............ 20
Section 10.12 Remedies; Equitable Relief ............ 20
Section 10.13 Attorneys' Fees ............ 20
Section 10.14 Mediation Requirement ............ 21
**Schedule 1 ............ 22**

**Operating Agreement**
**of**
**MBCI & Evercorp LLC**

This Operating Agreement of MBCI & Evercorp LLC (the "***Agreement***"), effective as of January 10, 2023 (the "***Effective Date***"), is entered into by and among the Company's Managers and Members. In consideration of the mutual covenants set forth herein and for other valuable consideration, the parties agree as follows:

# ARTICLE 1:
# FORMATION

**Section 1.1 Certain Definitions.**

As used in this Agreement, the terms below have the following meanings:

(a) "***Affiliate***" means, with respect to any Person, any other Person that directly or indirectly (through one or more intermediaries), controls, is controlled by, or is under common control with, the Person in question. With respect to a natural person, a Person's "***Affiliate***" is any other individual with whom the Person has a family relationship based on blood, marriage, or adoption to the second degree of consanguinity as determined by the laws of the State of Pennsylvania.

(b) "***Applicable Law***" means the laws enacted by the legislature of the State of Pennsylvania that are applicable to limited liability companies and the managers and members thereof.

(c) "***Assignee***" means the assignee of all or part of a Member's economic right to receive the share of profits and losses, and to participate in the distributions, attributable to the Transferring Member's Membership Interest. An Assignee's interest is economic only. An Assignee is not a Member, is not entitled to vote on any issue concerning the Company, and is only entitled to such Company information as is required by Applicable Law.

(d) "***Available Cash***" means cash on hand held by the Company that the Managers determine is not required by operations or as a reasonable reserve for anticipated expenses and capital replacements.

(e) "***Capital Account***" means the capital account of a Member in the Company pursuant to Section 4.3.

(f) "***Capital Contribution***" means any cash, cash equivalents, or the Fair Market Value of each property or other asset (other than cash) that a Member or Assignee contributes to the Company pursuant to this Agreement.

(g) "***Certificate***" means the Company's formation document filed with the State of Pennsylvania to legally establish the Company as a limited liability company under Applicable Law.

(h) "***Code***" means the Internal Revenue Code of 1986 and the regulations promulgated thereunder.

(i) "***Company***" means MBCI & Evercorp LLC.

(j) "***Contributed Property***" means each property or other asset (other than cash), in such form as may be permitted by Applicable Law, contributed to the Company by a Member (or deemed contributed to a new company on termination of the Company pursuant to Section 708 of the Code).

(k) "***Control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; "***controlling***" and "***controlled***" shall have correlative meanings.

(l) "***Fair Market Value***" means the amount that a willing buyer would pay a willing seller in an arms-length transaction, where both parties are knowledgeable of the material facts. Unless otherwise required by applicable law, determinations of Fair Market Value may be made by the Managers in their reasonable discretion, and in making such determinations the Managers may seek input from advisors.

(m) "***Majority Interest***" means one or more Members holding, *inter se*, a majority of the aggregate Percentage Interests held by the Members entitled to vote, voting as a single class.

(n) "***Managers***" means the Person(s) serving as Managers pursuant to Article 3.

(o) "***Member***" means any Person admitted to the Company as a Member of the Company as provided in this Agreement but excludes any such Person that has ceased to be a Member as provided in this Agreement.

(p) "***Membership Interest***" means a Membership Interest in the Company, including all rights and obligations that accompany such interest.

(q) "***Percentage Interest***" for any Member means the Membership Interest of a Member or Assignee expressed as a percentage. The Percentage Interests of the initial Members as of the formation of the Company are set forth on Schedule 1, which shall be revised as necessary to reflect any changes in Percentage Interests as provided herein. For all voting purposes, the Percentage Interest of an Assignee may not be voted by the Assignee or the applicable Transferor; and the determination of a "majority" (or other required voting ratios) of the Percentage Interests shall be made based on Percentage Interests held or attributed to Persons who are at the time Members.

(r) "***Person***" means any individual, corporation, partnership, limited liability company, business trust or other entity, series of an entity, or government or governmental agency or instrumentality.

(s) "***Supermajority***" means one or more Members collectively holding at least 67% of the aggregate Percentage Interests of all Members entitled to vote.

(t) "***Transfer***" (and corollary terms such as "Transferred" and "Transferring") when used with respect to a Membership Interest, means any sale, assignment, hypothecation, or other disposition of (i) all or a portion of such Membership Interest, or (ii) a controlling interest in (or right of control as to) an entity that is a Member. "Transferor" and "Transferee" shall refer to the parties to a Transfer.

**Section 1.2 Formation, Amendments, and Foreign Qualification.**

(a) The Company was formed as a limited liability company under and pursuant to Applicable Law by the filing of the Certificate on January 10, 2023. In the event required by Applicable Law, the Managers shall file all appropriate amendments to the Certificate.

(b) The Managers may cause the Company to qualify to do business as a limited liability company (or other entity in which the Members have limited liability) in any other jurisdiction and to designate any registered office or registered agent in any such jurisdiction. At the request of the Managers, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and (if authorized) terminate the Company as a limited liability company under the laws of each jurisdiction within which the Company will do business, and to this end the Managers may use the power of attorney granted in Section 10.5.

**Section 1.3** **Name.**

The name of the Company is MBCI & Evercorp  LLC. The Company shall conduct business under that name or such other names complying with applicable law as the Managers may determine from time to time.

**Section 1.4** **Term.**

The Company shall have a perpetual term unless wound up and terminated in accordance with this Agreement.

**Section 1.5** **Purpose.**

The purposes of the Company shall be the following: undefined

The Company may also engage in any other lawful business or activity necessary or convenient in pursuit of the foregoing (all activities described in this Section 1.5 collectively being the Company's "***Purpose***").

**Section 1.6** **Principal Office.**

The Company's principal office shall be 1150 1ST AVE STE 511, 19406, or such other place as the Managers may determine from time to time. The Company shall maintain records at its principal office as required by Applicable Law, and the Managers shall provide the Members with written notice of any change in the Company's principal office within a reasonable time after such change. The Company may have such other offices as the Managers may designate from time to time.

**Section 1.7** **Registered Office and Registered Agent.**

The initial address of the registered office of the Company in the State of Pennsylvania shall be 1150 1ST AVE STE 511, 19406 and the name of the Company's initial registered agent at that address shall be Registered Agents Inc. The Managers may change the registered office and the registered agent of the Company from time to time.

## ARTICLE 2:
## MEMBERS AND MEMBERSHIP INTERESTS

**Section 2.1** **Initial Member(s).**

The Person(s) executing this Agreement and identified on Schedule 1 are hereby admitted to the Company (or confirmed) as its initial Member(s) effective as of the Effective Date. The Percentage Interest held by each Member is set forth next to such Member's name on Schedule 1, which shall be updated from time to time as necessary to reflect the Transfer of Membership Interests or the issuance of new/additional Membership Interests.

**Section 2.2** **Issuance of New Membership Interests.**

The Company may only issue new or additional Membership Interests (a "***New Issuance***") on such terms and conditions as are approved by a Majority Interest. Any such approval shall include approval of the Capital Contribution, if any, required in connection with the New Issuance, the Percentage Interest represented by the New Issuance, and all changes in the Percentage Interests of the existing Members prior to the New Issuance. Notwithstanding the foregoing, each Member whose Percentage Interest will be reduced by more than his/her/its Pro Rata Reduction upon a New Issuance, must consent to such New Issuance. A Member's "***Pro Rata Reduction***" is calculated by multiplying (a) such Member's Percentage Interest prior to a New Issuance by (b) the new or additional Percentage Interest being granted by the New Issuance. Membership Interests may be issued with or without Capital Accounts or voting rights, and may be issued for services rendered or to be rendered.

**Section 2.3 Nature of Membership Interest and Company Property.**

(a) All property, tangible or intangible, that is acquired by the Company shall be owned by the Company and held in the name of the Company or (if a Majority Interest agrees) in the name of one or more Managers. A Member shall not have any interest in specific items of property of the Company, and a Member may not require a distribution from the Company in any form other than cash. Each Member hereby expressly waives the right to require partition of any Company property.

(b) Except as expressly allowed in this Agreement, and without superseding more stringent restrictions on Transfers contained in this Agreement, a Member shall not encumber, pledge, make an assignment for the benefit of non-Member creditors, or otherwise subject his/her/its Membership Interest or any Company property to any liens or any other type of security interest in favor of such Persons without the written consent of the Managers, and any such act without proper written consent shall be void and without force or effect.

**Section 2.4 Withdrawal or Expulsion of Member Prohibited.**

A Member may not withdraw or be expelled from the Company. However, upon the Transfer of a Membership Interest, the Transferring Member shall cease to be a Member with respect to such Membership Interest.

**Section 2.5 Restrictions on Transfer of Interests; Right of First Refusal.**

(a) *GENERALLY*. NO MEMBERSHIP INTEREST MAY BE TRANSFERRED, IN WHOLE OR IN PART, EXCEPT IN ACCORDANCE WITH THE TERMS AND CONDITIONS SET FORTH IN THIS SECTION 2.5, AND ANY TRANSFER OR PURPORTED TRANSFER MADE IN VIOLATION OF THIS SECTION SHALL BE NULL AND VOID.

(b) *Restriction on Transfer*. No Membership Interest may be Transferred unless:

(i) (A) The Transfer is approved in writing by the Managers and a Supermajority, in their absolute discretion, and (B) the requirements of Section 2.5(e) are met; or

(ii) The Transfer results from a testamentary Transfer or other Transfer in connection with a Member's death, a Transfer in connection with a divorce decree or other court order, or any other involuntary Transfer occurring by operation of law.

(c) *Other Requirements*. In connection with any Transfer permitted by Section 2.5(b)(i), the Managers may (i) require the Transferor and/or Transferee (at their expense) to provide an opinion of counsel from an attorney satisfactory to the Managers that the Transfer will not violate any law (including securities laws); (ii) disallow the Transfer if the Managers reasonably conclude that it would cause a violation of law; (iii) require the Transferee to execute an instrument reasonably satisfactory to the Managers accepting all obligations of a Member or an Assignee, as the case may be, under this Agreement; and/or (iv) require the Transferor and/or Transferee to pay the reasonable costs and fees (including legal/accounting fees) incurred by the Company in connection with the Transfer.

(d) *Transferee as Assignee*. If a Membership Interest is Transferred pursuant to Section 2.5(b), the Transferee shall hold such Membership Interest as an Assignee only, unless and until the Managers and a Supermajority of disinterested Members, in their absolute discretion, consent in writing to the admission of the Transferee as a full Member. For avoidance of doubt, if the Transferee was already a Member prior to the Transfer in question, the Transferee shall nevertheless have only the rights and status of an Assignee with respect to the Transferred interest unless the required consent is obtained.

(e) *Right of First Refusal.*

(i) Any Member who desires to Transfer all or any part of such Member's Membership Interest (the "***Offered Interest***") in any transaction other than a Transfer described in Section 2.5(b)(ii) shall, in addition to otherwise complying with the Transfer restrictions contained in this Agreement, first (A) provide notice (the "***ROFR Notice***") of the price and terms of such Transfer, along with the identity of the Transferee, and (B) offer to sell the Offered Interest to the other Members. The other Members shall have the option, for a period of thirty (30) days after receipt of the ROFR Notice, to collectively elect to purchase all (and not less than all) of the Offered Interest at the price and terms specified in the ROFR Notice. If more than one Member elects to purchase the Offered Interest pursuant to this Section 2.5(e), they shall, absent a different agreement at the time, acquire the Offered Interest pro rata based on their Percentage Interests.

(ii) If all or any portion of the purchase price specified in the ROFR Notice is not cash, such noncash consideration shall be deemed cash equal to its Fair Market Value. If the applicable parties are unable to reach agreement as to such Fair Market Value, then the Fair Market Value shall be determined by a qualified third-party appraiser agreed-upon by the parties (or, failing such agreement, appointed by the Company in its sole discretion), and such appraiser's determination of fair market value shall be binding on the parties.

(iii) The closing of any sale of a Membership Interest pursuant to this Section 2.5(e) shall take place within thirty (30) days after the later of (A) the exercise by one or more Member(s) of their option hereunder or (B) the determination of the Fair Market Value of any noncash consideration. At such closing, the selling Member shall assign and deliver the Membership Interest to the acquiring Member(s) free and clear of all security interests, liens or other encumbrances.

(iv) If no Member(s) elect to purchase the entire Offered Interest pursuant to this Section 2.5(e), and if the offering Member has received the necessary approvals and otherwise complied with this Section 2.5, the offering Member shall have sixty (60) days after expiration of the option of the other Members in which to sell the offered Membership Interest as stated in the ROFR Notice.

(v) An Assignee shall be subject to this Section 2.5(e) in the same manner as a Member.

(f) *Certain Buyout Rights.*

(i) For a period of ninety (90) days after the occurrence of a Transfer described in Section 2.5(b)(ii), the Company shall have the option to purchase all, and not less than all, of the Transferred Membership Interest in question (the "***Transferred Interest***") for its Purchase Value (as determined pursuant to Section 2.5(f)(ii)) from the Transferee of the Transferred Interest (the "***Selling Party***"). If the Company declines to exercise its purchase option hereunder, then for a period of thirty (30) days following the Company's 90-day option period, each Member shall have the option to purchase all, and not less than all, of the Transferred Interest for its Purchase Value. If more than one Member elects to purchase the Transferred Interest pursuant to the option granted hereunder, they shall, absent a different agreement at the time, acquire the Transferred Interest pro-rata in accordance with their respective Percentage Interests. Any party exercising his/her/its purchase option under this subsection (the "***Buying Party***," whether one or more) must provide notice of same to all Members and Managers within the applicable option period. The closing of any purchase pursuant to this subsection shall be in accordance with Section 2.5(f)(iii) and shall take place within thirty (30) days after the later of (A) the exercise of the purchase option granted hereunder or (B) the determination of the Purchase Value.

(ii) In this Section 2.5(f), "***Purchase Value***" shall mean the amount of cash that would be received by the Selling Party if the Company sold its assets for cash at a purchase price equal to their Fair Market Value, paid all outstanding obligations and liabilities, and distributed all remaining cash to the Members and Assignees in accordance with Section 6.1. The Purchase Value shall be determined as of a date as near as reasonably practicable to the date of the event that resulted in the Transfer of the Transferred Interest. Absent agreement upon the Purchase Value, the Buying Party and Selling Party shall mutually agree upon and engage an independent, qualified appraiser to determine the Purchase Value of the Transferred Interest pursuant to the terms hereof, and such determination shall be binding on the Buying Party and Selling Party; *provided that* the Buying Party may elect not to proceed with the purchase by written notice (as "***Cancellation Notice***") to the Selling Party no later than ten (10) days following the completion of the appraisal. The Buying Party and Selling Party shall instruct the appraiser to complete the appraisal within sixty (60) days. If the Buying Party and Selling Party are unable to agree upon an appraiser, either party may petition a court of competent jurisdiction to appoint an appraiser. The Buying Party and Selling Party shall equally share the cost of the appraisal. Notwithstanding the foregoing, if the Buying Party elects not to proceed with the purchase by sending a Cancellation Notice to Seller, the Buying Party shall be required to (A) pay the full cost of the appraisal, and (B) reimburse the Selling Party for its court costs and reasonable attorneys' fees, if any, incurred by the Selling Party prior to the date of the Cancellation Notice.

(iii) At the closing of any sale of a Membership Interest pursuant to this Section 2.5(f), the Selling Party shall assign and deliver the Transferred Interest to the Buying Party free and clear of all security interests, liens, or other encumbrances. Payment of the Purchase Value shall be in cash at the time of the closing unless otherwise agreed by the parties. Any transfer or similar taxes involved in such sale shall be paid by the Selling Party, and the Selling Party shall provide the Buying Party with such evidence of the Selling Party's authority to sell hereunder and such additional instruments as the Buying Party may reasonably request.

**Section 2.6 Rights and Duties of Transferors and Assignees.**

(a) An Assignee who is not admitted as a Member shall be subject to those restrictions, and possess only those economic rights, as are described in the definition of "Assignee" in Section 1.1. An Assignee is not liable as a Member until the Assignee becomes a Member.

(b) An Assignee, after becoming a Member, is entitled to the same rights and powers, and subject to the same restrictions and liabilities, applicable to a Member under this Agreement. However, an Assignee, after becoming a Member, is not obligated for a liability of the Transferor that: (i) the Assignee did not have knowledge of on the date the Assignee became a Member; and (ii) could not be ascertained from this Agreement.

(c) The Transferor of a Membership Interest ceases to be a Member with respect to, and may no longer exercise any rights or powers (including voting rights) with respect to, the Transferred Membership Interest.

**Section 2.7 Certificates.**

Membership interests in the Company shall be uncertificated.

**Section 2.8 Representations and Warranties.**

Each Member represents and warrants to the Company and each Member that (a) if the Member is a corporation, LLC, partnership, trust, or other entity, such Member (and each of its equity owners, if applicable) is duly organized and in good standing under the law of the state of its formation, (b) the Member has the authority to execute this Agreement and to perform its obligations hereunder, and (c) the Member's execution and

performance of this Agreement will not conflict with any other agreement or order by which that Member is bound.

## ARTICLE 3: MANAGEMENT OF THE COMPANY, MEETINGS, AND VOTING

**Section 3.1 Management.**

(a) Except to the extent otherwise restricted by this Agreement (including Section 3.1(b) below) or as required by non-waivable provisions of Applicable Law, the exclusive authority to manage, control and operate the Company and its assets shall be vested in the Managers of the Company. The Managers shall have the authority to manage the affairs of the Company and make all decisions with respect thereto, including the authority to make all decisions and perform all acts incidental to and in the ordinary course of the Company's business, except for those matters expressly reserved to the Members by this Agreement. Each Manager is an agent of the Company for the purpose of carrying out the Company's business in accordance with the authority granted by action of the Managers. The foregoing shall not restrict the authority of the officers of the Company as described in Section 3.6 below. By the unanimous vote of all Managers, the authority of the Managers to act may be delegated to a committee of less than all of the Managers.

(b) Notwithstanding the foregoing, the Managers may not cause the Company to do any of the following without the express consent of a Majority Interest (or such higher percentage as may be required under Applicable Law or this Agreement):

(i) Enter into a merger, interest exchange, conversion, or sale of all or substantially all of the Company's assets with any other Person;

(ii) Except as set forth in this Agreement, wind up or liquidate the Company;

(iii) Except as allowed by court order or as provided in this Agreement, distribute any Company property other than cash to a Member;

(iv) Undertake business not expressly or impliedly contemplated by the Company's Purpose;

(v) Loan money to any Person outside of the Company's ordinary course of business;

(vi) Partition the Company's property; or

(vii) Authorize any act that would make it impossible to carry on the business of the Company.

(c) In managing the business and affairs of the Company and exercising its powers, the Managers shall only act (i) collectively through meetings and/or written consents as provided in this Agreement; (ii) through committees established pursuant to this Agreement; and (iii) through Managers or officers to whom authority and duties have been delegated pursuant to this Agreement. All actions of the Managers shall require the approval of a majority of the Managers unless otherwise specified herein or by non-waivable Applicable Law.

(d) No Member in his/her/its capacity as such shall have any authority or right to act for or bind the Company or participate in or have control over Company business except as otherwise allowed by this Agreement, a specific written authorization of the Managers, or applicable law.

**Section 3.2 Initial Manager(s); Number and Qualifications.**

(a) The initial Manager(s) shall be the Manager(s) executing this Agreement on the Effective Date. The Managers of the Company may consist of one or more Persons. Except as provided by Section 3.2(b), the number of Managers of the Company consists of the number of Managers executing this Agreement on the Effective Date.

(b) The number of Managers of the Company may be increased or decreased only by written resolution of the Managers; provided, however, that no decrease in the number of Managers that would have the effect of shortening the term of an incumbent Manager may be made by the Managers.

(c) A Manager of the Company is not required to be a resident of Pennsylvania or a Member.

**Section 3.3 Term.**

Unless a term is specified upon a Manager's election, as provided herein, each Manager shall serve until the resignation, removal, legal incapacity, or death of the Manager. If a term is specified upon the election of a Manager, the Manager shall serve for the specified term and until the Manager's successor is elected or until the earlier resignation, legal incapacity, removal, or death of the Manager.

**Section 3.4 Resignation and Removal.**

A Manager may resign at any time by giving written notice to the Company. Such resignation shall take effect at the time specified therein or, if no time is specified, at the time of its receipt by the Company. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. A Manager may be removed, with or without cause, by the vote of a Majority Interest.

**Section 3.5 Manager Vacancy.**

A vacancy in the position of a Manager may only be filled by the vote of a Majority Interest. A Manager elected to fill a vacancy occurring other than by reason of an increase in the number of Managers shall be elected for the unexpired term of its predecessor in office.

**Section 3.6 Officers, Employees, and Other Agents.**

The Managers may appoint/remove officers of the Company and hire/terminate employees on such terms and for such compensation as the Managers deem appropriate. The Managers may delegate to the Company's officers such powers and duties as the Managers may deem appropriate and subsequently revoke or modify those powers and duties. Except to the extent that the Managers determine otherwise, and subject to those powers and duties already delegated to other individuals, each officer will have the powers and duties normally associated with an officer having a similar title with a Pennsylvania company.

**Section 3.7 Location of Meetings; Alternative Forms.**

Meetings of the Members or Managers may be held at (a) the principal office of the Company or (b) a place in or outside the State of Pennsylvania as agreed to by a majority of all Persons entitled to notice of the meeting. Meetings may be conducted in person, by telephone, or by any electronic communications system allowing each participant to communicate with all other participants.

**Section 3.8 Notice of Meetings; Waiver.**

(a) Notice of a meeting of the Members or the Managers must be given in a manner described in Section 10.1 and state the purpose(s), date, time, and location of the meeting (or the alternative form of communication

used for the meeting). Only business coming within the purposes described in the required notice or added to the agenda of the meeting by unanimous approval of all Members or Managers (as applicable) may be conducted at a meeting.

(b) Notice of a meeting is not required to be given to a Member or Manager entitled to notice under this Agreement if the Person entitled to notice signs a written waiver of notice of the meeting, regardless of whether the waiver is signed before or after the time of the meeting. If a person entitled to notice of a meeting participates in the meeting, the person's participation constitutes a waiver of notice of the meeting unless the person participates in the meeting solely to object to the transaction of business at the meeting. Notice of a meeting shall be given not later than the tenth (10th) day or earlier than the sixtieth (60th) day before the date of the meeting.

(c) Any Manager may call a meeting of the Managers by notice to each other Manager. The Managers, or any Member(s) holding, *inter se*, at least twenty-five percent (25%) of the aggregate Percentage Interests held by Members, may call a meeting of the Members by notice to all Members.

**Section 3.9 <u>Quorum and Required Vote.</u>**

(a) No specific number of Members or Managers is required to establish a quorum for the purpose of conducting a meeting; *provided however* that, unless a greater vote is required by Applicable Law or this Agreement, (i) any act of the Members at a meeting shall require the vote of a Majority Interest of *all* Members (not merely those present at the meeting); and (ii) any act of the Managers at a meeting shall require the vote of a majority of *all* Managers (not merely those present at the meeting).

(b) A Member or Manager who is present at a meeting at which action on any Company matter is taken shall be presumed to have assented to the action unless (i) the Member withdrew from the meeting prior to the time such action was taken and such withdrawal is noted in the meeting minutes, (ii) the Member's dissent to such action is entered in the meeting minutes, or (iii) the Member files a written dissent to such action with the Company within 24 hours after the adjournment of the meeting. Such right to dissent shall not apply to a Member who voted in favor of such action at the meeting.

**Section 3.10 <u>Action by Written Consent.</u>**

An action may be taken without holding a meeting, without providing notice, or without taking a vote if a written consent or consents stating the action to be taken is obtained from the number of Members or Managers, as appropriate, necessary to have at least the minimum number of votes that would be necessary to take the action at a meeting at which each Member or Manager, as applicable, entitled to vote on the action is present and votes. With regard to any action approved in accordance with this Agreement by written consent of less than all Members or Managers, no prior notice of such action is required to be given to non-approving Members or Managers.

**Section 3.11 <u>Compensation</u>**.

Unless otherwise authorized by a Majority Interest, the Managers shall not be compensated for their services in their capacity as Managers but shall be reimbursed for all expenses reasonably incurred by them in the course and scope of services rendered in accordance with this Agreement.

## ARTICLE 4:
## CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

**Section 4.1 <u>Agreed Capital Contributions.</u>**

Each initial Member shall contribute to the capital of the Company the Capital Contribution set forth opposite such Member's name on the attached <u>Schedule 1</u>. Any Person issued a Membership Interest after the formation of


Case 1:23-cr-00064-LTS-MAR Document 80-4 Filed 09/12/24 Page 12 of 22

the Company shall contribute to the capital of the Company the Capital Contribution, if any, approved as provided in Section 2.2. Neither a Member nor an Assignee is entitled to the return of any part of its Capital Contribution, or to be paid interest in respect thereof, except through distributions as provided herein.

**Section 4.2 Additional Capital Contributions.**

The Managers may request, but may not require, that the Members make additional Capital Contributions.

**Section 4.3 Capital Accounts.**

The Company shall maintain for each Member a separate Capital Account that shall initially reflect the Member's Capital Contribution (if any). A Member's Capital Account shall be increased by (a) the amount of that Member's Capital Contributions made to the Company pursuant to this Agreement, and (b) all items of Company income and gain (including, without limitation, income and gain exempt from tax) allocated to such Member pursuant to this Agreement, and decreased by (x) the amount of cash or Fair Market Value of all distributions of cash or property made to or for such Member by the Company, and (y) all items of Company deduction and loss allocated to such Member pursuant to this Agreement. This provision and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Managers determine that it is prudent to modify the manner in which the Capital Accounts, or increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Managers may authorize such modifications.

**Section 4.4 Advances.**

If the Company does not have sufficient cash to pay its obligations, any Member(s) may, with the Managers' consent, elect to loan/advance all or part of the needed funds to or on behalf of the Company, on such terms as the Managers and the Member in question agree upon. Any such advance/loan shall be evidenced by a promissory note.

## ARTICLE 5:
## TAXATION AND ALLOCATIONS

**Section 5.1 Allocations Generally.**

For each fiscal year (or portion thereof), income and loss of the Company shall be allocated among the Members in a manner such that, after giving effect to the tax and regulatory allocations set forth in Section 5.2, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to the distributions that would be made to such Member pursuant to Section 6.1 if the Company was dissolved, its affairs wound up and its assets sold for cash equal to their book value, all Company liabilities were satisfied, and the assets of the Company were distributed, in accordance with Section 6.1.

**Section 5.2 Tax and Regulatory Allocations.**

To the extent the Code requires allocations for tax purposes that differ from the foregoing allocations, the Managers may determine the manner in which such tax allocations shall be made so as to fully comply with the Code and other applicable law, and at the same time (to the extent reasonably possible) preserve the economic relationships among the Members as set forth in this Agreement.


Case 1:23-cr-00064-LTS-MAR Document 80-4 Filed 09/12/24 Page 13 of 22

**Section 5.3** **Reporting.**

The Members are aware of the income tax consequences of the allocations made by this Article 5 and hereby agree to be bound by the provisions of this Article 5 in reporting their shares of Company items for income tax purposes.

## ARTICLE 6:
## DISTRIBUTIONS

**Section 6.1** **Distributions Generally.**

The Company shall distribute Available Cash, if any, at such times and in such amounts as the Managers, in their sole discretion, shall determine, and such distributions shall be made to the Members according to their Percentage Interests unless the Members unanimously agree otherwise. All distributions to a Member shall be subject to the Company's right of setoff for obligations owed by such Member to the Company.

**Section 6.2** **Optional Annual Tax Distribution.**

If and to the extent determined appropriate by the Managers, and if otherwise permitted by law, the Managers may elect to make cash distributions each year to each of the Members to pay the federal and state income tax liability incurred as a result of the allocation of income/gain to the Members pursuant to Section 5.1. All amounts distributed to a Member pursuant to this subsection shall be credited against any future distributions made to such Member pursuant to Section 6.1.

## ARTICLE 7:
## BANK ACCOUNTS, BOOKS, REPORTS, AND FISCAL YEAR

**Section 7.1** **Bank Account.**

The Managers shall establish one or more bank or other financial institution accounts into which all Company funds shall be deposited. Funds deposited by the Company into such accounts may be withdrawn only in furtherance of the business of the Company or for distribution to the Members pursuant to this Agreement.

**Section 7.2** **Books, Records, and Other Information.**

(a) The books and records of the Company shall be maintained at the Company's principal office (in hard copy or electronic form) and all Members shall be allowed reasonable access to such records for any proper purpose. The books of the Company, for both tax and financial reporting purposes, shall be kept using the method of accounting selected by the Managers, consistently applied. Each Member is entitled to access to information in accordance with Applicable Law and as otherwise provided in this Agreement.

(b) A Person who ceases to be a Member, Assignee, and/or Manager, shall, immediately upon request from the Managers, return all confidential materials of the Company, including originals, copies, derivatives, and summaries, in whatever form or media stored, and all personal property of the Company.

**Section 7.3** **Tax Classification; Tax Returns and Information.**

The Members intend for the Company to initially be treated as a partnership for tax purposes (or disregarded if the Company is a single-member LLC). However, the Managers may elect a different tax treatment (including S-Corporation or C-Corporation treatment) if they believe it to be in the best interest of the Company, comply with the Code, and maintain to the greatest extent possible the economic arrangement of the Members as expressed in this Agreement; *provided that* a Majority Interest approves such tax election. Notwithstanding the foregoing, the Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership)

or joint venture under applicable state law, and that no Member or Manager shall be deemed a partner or joint venturer hereunder of any other Member or Manager, for any purposes other than federal and state tax purposes, if applicable, and this Agreement shall not be construed to suggest otherwise. The Managers shall prepare or cause to be prepared all federal, state and local income and other tax returns which the Company is required to file and shall furnish each Member both a copy of such Member's Schedule K-1 and the Company's tax return as soon as is reasonably practicable after the end of each Company fiscal year.

**Section 7.4 Tax Audits and the Tax Representative.**

The Members hereby appoint Margo Williams as the "partnership representative" (the "***Partnership Representative***") as provided in Code Section 6223(a), as amended by the Bipartisan Budget Act of 2015. The Partnership Representative shall have such powers, discretion, and authority as are granted under the Code. The Partnership Representative may resign at the times and in the manner set forth in applicable Treasury Regulations or other administrative guidance or may be removed by the vote of a Majority Interest. If the Partnership Representative ceases to be the Partnership Representative for any reason, a Majority Interest shall appoint a new Partnership Representative.

**Section 7.5 Fiscal Year.**

The Company fiscal year shall be the calendar year ending December 31 unless the Managers determine otherwise.

## ARTICLE 8:
## DUTIES, INDEMNIFICATION, AND CONFIDENTIALITY

**Section 8.1 Exculpation.**

(a) For purposes of this Agreement, "***Covered Person***" means (i) any Manager, (ii) any Member, (iii) any Person with control over any Manager or Member, (iv) any officer, employee, agent, or equity owner of any Manager or Member, and (v) any officer, employee, or agent of the Company.

(b) No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by the Covered Person in good faith reliance on this Agreement, provided that such act or omission did not constitute fraud or willful misconduct. Each Covered Person shall be protected by the Business Judgment Rule and shall not be liable for mere negligence.

(c) Each Covered Person may, in good faith and with ordinary care, rely upon (i) the advice, information, and opinions of other Covered Persons, employees, attorneys, accountants, professional consultants and experts who such Covered Person reasonably believes are qualified to give the advice, information, or opinions in question, (ii) the records of the Company, and (iii) the authenticity of documents that they reasonably believe to be genuine, and shall have no liability to the Company or its Members for actions taken or decisions reasonably made in good faith based upon such documents, advice, information, and/or opinions.

**Section 8.2 Scope of Duties of Covered Persons; Outside Activities.**

(a) The provisions of Sections 8.1 and 8.2 are intended to limit liability with regard to the duties, if any, owed or asserted to be owed by Covered Persons. This Agreement does not create, and is not intended to create or impose, fiduciary duties upon any Covered Person. Moreover, the Company and each Member hereby waives any and all fiduciary duties that may be imposed upon any Covered Person by Applicable Law in the absence of such wavier. Each Member and the Company agrees that the only duties owed by each Covered Person to one another and the Company are those that are expressly set forth in this Agreement.

(b) The Managers shall devote such time and effort to the Company's business and operations as they reasonably deem necessary to promote fully the interests of the Company; however, no Manager (in such capacity) is required to devote full time to Company business unless otherwise provided by a separate agreement.

(c) Nothing contained in this Agreement shall prevent any Member or Manager (or any of their Affiliates) from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the businesses or activities of the Company. None of the Members or Managers (nor any of their Affiliates) shall be obligated to account to the Company or to the other Members or Managers for any profits or income earned or derived from such other activities or businesses. None of the Members or Managers (nor any of their Affiliates) shall be obligated to inform the Company or the other Members or Managers of a business opportunity of any type or description.

**Section 8.3 Indemnification.**

(a) To the fullest extent permitted by Applicable Law, but subject to any limitations expressly provided in this Agreement, each Covered Person shall be indemnified and held harmless by the Company from and against any and all claims, causes of action, judgments, fines, penalties and interest, liabilities, losses, damages, and expenses, including legal fees (collectively, "***Obligations***"), to which such Covered Person becomes subject as a result of such Covered Person's relationship with or services to the Company; *provided, that* in each case the Covered Person acted in good faith, did not engage in fraud or willful misconduct, acted in a manner that such Covered Person reasonably believed to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, the Covered Person had no reasonable cause to believe his/her/its conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere, or its equivalent, shall not create a presumption that the Covered Person acted in a manner contrary to that specified above

(b) Expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit, or proceeding shall, from time to time, be advanced by the Company before the final disposition of the claim, demand, action, suit or proceeding upon receipt by the Company of a written undertaking by or on behalf of the Covered Person to repay that amount if it shall be judicially determined that the Covered Person is not entitled to be indemnified under this Section 8.3.

(c) Any indemnification pursuant to this Section shall be paid from the Company's assets only. Neither the Managers, nor any Member (or Assignee), shall be personally liable to fund an indemnification or to make Capital Contributions to allow the Company to fund an indemnification.

(d) A Covered Person's right to indemnification as to an Obligation shall not be reduced or impaired by any modification/amendment of this Section after (i) the assertion of the Obligation, or (ii) the occurrence of the circumstances on which the Obligation is based.

**Section 8.4 Insurance.**

The Company may (but is not obligated to) purchase and maintain insurance, to the extent and in amounts the Managers reasonably deem appropriate, on behalf of Covered Persons and any other Persons that the Managers shall determine, against any liability that may be asserted against or expenses that may be incurred by that Person in connection with the activities of the Company. The Company shall have no obligation to fund indemnification of any Person to the extent the liability is covered by insurance.

**Section 8.5 Duration of Protection.**

All provisions of this Article 8 shall apply to any former Covered Person for all actions or omissions taken by him/her/it while he/she/it was a Covered Person.

**Section 8.6** **General Limitation of Liability of Members and Managers.**

Except as otherwise expressly agreed in writing, no Member or Manager shall have personal liability for the debts, obligations, or liabilities of the Company, including those arising against the Company under a judgment, decree or order of a court.

**Section 8.7** **Confidentiality.**

(a) Each Member and Manager acknowledges that he/she/it will have access to information that is developed by the Company in pursuit of its Purpose and treated as confidential and proprietary by the Company, including, without limitation, trade secrets, technology and software, patents, copyrights, trademarks, trade dress, and other intellectual property; proprietary databases; and information pertaining to business operations and strategies, contact lists, finances, personnel, and operations of the Company and its Affiliates, in each case whether spoken, written, printed, electronic or in any other form or medium (collectively, the "***Confidential Information***"). Confidential Information shall include all information of the Company that a reasonable Person would identify as such. Any Confidential Information developed by a Member or Manager in connection with their involvement with and services to the Company shall also be subject to the terms and conditions of this Section 8.7. Each Member and Manager shall treat all Confidential Information as strictly confidential, shall not disclose Confidential Information or permit it to be disclosed, in whole or part, to any third party without the prior written consent of the Managers in each instance, and shall not use any Confidential Information for any purpose except as required in the Company's pursuit of its Purposes. Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by Applicable Law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation or order. Each Member and Manager agrees to provide written notice of any such order to an authorized officer or Manager of the Company within one (1) day of receiving such order.

(b) The restrictions of Section 8.7(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member or Manager in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member or Manager without use of Confidential Information; or (iii) becomes available to such Member or Manager or any of their Affiliates on a non-confidential basis from a source other than the Company, the other Members or Managers, or any of their respective Affiliates, provided, that such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

## ARTICLE 9:
## WINDING UP

**Section 9.1** **Events Requiring Winding Up.**

The Company shall be wound up only on the first to occur of any one or more of the following:

(a) The expiration of any period fixed in the Certificate for the duration of the Company, or the occurrence of an event specified in the Certificate that requires winding up;

(b) The occurrence of an event that requires winding up under Applicable Law;

(c) The decision of a Majority Interest (in accordance with this Agreement) to wind up the Company;

(d) The occurrence of any event that terminates the membership of the last remaining Member; or

(e) The entry of a decree by a court requiring the winding up and termination of the Company.

**Section 9.2** **Revocation or Reinstatement.**

A vote or consent to wind up as provided in Section 9.1(c) may only be revoked upon the unanimous vote or consent of the Members. In the event of a termination of the Company under Applicable Law, the Company may only be reinstated upon the vote or written consent of a Supermajority.

**Section 9.3** **Winding Up Affairs and Distribution of Assets.**

(a) If an event requiring the winding up of the Company occurs and is not revoked, the Managers or, if there are no remaining Managers, a Person designated for this purpose by the Members (the remaining Manager(s) or the Person so designated being called the "***Liquidator***"), as soon as practicable shall wind up the affairs of the Company and sell and/or distribute the assets of the Company. The Liquidator is expressly authorized and empowered to execute any and all documents necessary or desirable to effectuate the liquidation and termination of the Company and the sale or other transfer of its assets. The Liquidator shall apply and distribute the proceeds of the sale or liquidation of the assets and property of the Company to pay (or to make provision for the payment of) all creditors of the Company (including Members who are creditors of the Company), in the order of priority provided by law or otherwise, in satisfaction of all debts, liabilities or obligations of the Company owed to its creditors. Thereafter, liquidating distributions shall be made to the Members in accordance with Section 6.1.

(b) The Liquidator shall have sole discretion to determine whether to liquidate all or any portion of the assets and property of the Company and the consideration to be received for that property.

(c) Except as required by non-waivable provisions of Applicable Law, no Member shall have any obligation at liquidation to contribute any funds to replenish any negative balance in the Member's Capital Account.

**Section 9.4** **Termination.**

Upon the conclusion of the winding up process set forth above, the Liquidator shall execute and cause to be filed the documents required by Applicable Law to terminate the existence of the Company. Except as otherwise provided by Applicable Law, the Company shall cease to exist upon the filing of such termination documents.

## ARTICLE 10:
## MISCELLANEOUS PROVISIONS AND DEFINITIONS

**Section 10.1** **Notices.**

Any notice to be given under this Agreement must be in writing and either (a) personally delivered to the recipient, or (b) mailed or e-mailed to an address or email address regularly utilized by the recipient. Notice to the Company may be made by personal delivery, mail, or email to any Manager or officer of the Company, or by delivery or mail to the Company's registered address. The Company shall maintain a list of each officer's and Manager's official email address with the Company, as well as a list of the email addresses provided to the Company by the Members, and provide such list to any Member upon request. Notice by mail is considered delivered three days after its postmarked date. Notice by email is considered delivered upon successful transmission. Notice by personal delivery is considered delivered upon receipt by the intended recipient.

**Section 10.2** **Entire Agreement.**

This Agreement constitutes the entire agreement of the Members and Managers with respect to its subject matter, and supersedes all prior agreements and understandings, whether oral or written, among the Members and Managers with respect to the Company. In choosing to execute this Agreement and be bound by its terms, no Member or Manager is relying upon any representation other than those set forth herein.

**Section 10.3 Amendments.**

(a) Except as otherwise expressly provided in this Agreement, this Agreement and the Certificate may be amended only by a written instrument executed by the Managers and a Supermajority. If the requisite approval is obtained, any such amendment shall be binding upon all Members and Managers.

(b) Notwithstanding the foregoing, without the consent of the affected Member, no amendment to this Agreement may be made that (i) increases the liability of a Member beyond the limitations established by this Agreement or Applicable Law, (ii) requires a Member to make a Capital Contribution when such Member would otherwise not be required to do so, or (iii) except as allowed by this Agreement (including Section 2.2), reduces a Member's Percentage Interest or entitlement to distributions. Moreover, the Managers may, without the consent of any Members, amend the name of the Company pursuant to Section 1.3 or amend Schedule 1 to reflect any admission of new Members, Transfers of Membership Interests, or adjustments to the Members' Percentage Interests, but in each case only if such events occurred in compliance with the other terms of this Agreement.

**Section 10.4 Governing Law; Submission to Jurisdiction.**

This Agreement shall be governed by and construed in accordance with the laws of the State of Pennsylvania, without regard to its conflict of law principles. This Agreement is performable in Montgomery County, Pennsylvania, and the sole venue for any dispute relating to this Agreement (whether in state or federal court) shall be located in Montgomery County, Pennsylvania.

**Section 10.5 Power of Attorney.**

Each Member constitutes and appoints the Managers, and each of them and their successors, the true and lawful attorney of such Member with full power of substitution to make, execute, sign, acknowledge, and file (a) all certificates and instruments necessary to form or qualify, or continue the existence or qualification of, the Company in any jurisdiction or before any governmental authority and (b) any amendments to Schedule 1 to this Agreement to reflect the admission of any new Member if the same is authorized by this Agreement. This grant of a power of attorney is coupled with an interest and shall survive a Member's disability, incompetence, death or assignment by such Member of the Membership Interest pursuant to this Agreement.

**Section 10.6 Successors and Assigns; No Third-Party Beneficiaries.**

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective spouses, heirs, devisees, executors, legal representatives, successors, and assigns. Except with respect to Article 8, which shall inure to the benefit of and be enforceable by Covered Persons as defined therein, there are no third-party beneficiaries to this Agreement.

**Section 10.7 Counterparts.**

This Agreement may be executed in any number of counterparts or with counterpart signature pages, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**Section 10.8 Construction.**

Each of the Members has had a full and fair opportunity to review this Agreement and to confer with counsel regarding same. Accordingly, the doctrine of construction that interprets language in an agreement against the draftsman shall not apply here. Furthermore, in this Agreement (a) terms defined in the singular have the corresponding meaning in the plural and vice versa; (b) all pronouns and any variations thereof contained herein shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the Person or Persons may require; (c) if there is only one Member or one Manager, then references to "Members" or "Managers" shall mean that one Member or Manager (as applicable); (d) the word "include" and its derivatives


Case 1:23-cr-00064-LTS-MAR Document 80-4 Filed 09/12/24 Page 19 of 22

means "include without limitation;" (e) references to Articles, Sections and Exhibits are to the specified Articles and Sections of, and Exhibits to, this Agreement unless the context otherwise requires, and each Exhibit to this Agreement is made a part of this Agreement for all purposes; (f) references to statutes or regulations are to those statutes or regulations as currently amended and to the corresponding provisions as they may be amended or superseded in the future; (g) the captions contained herein are solely for the convenience of the Parties and such captions shall not be considered in the construction of this Agreement; and (h) in the event of an inconsistency between any provisions, that provision imposing the more stringent restrictions in favor of the Company shall prevail.

**Section 10.9 Severability.**

The terms of this Agreement shall be deemed severable. In the event any provision of this Agreement is held invalid or unenforceable to any extent by a tribunal of competent jurisdiction, (a) the remainder of this Agreement and the application of that provision to other circumstances shall remain enforceable to the extent allowed by law, and (b) the affected provision shall be reformed to the minimum extent necessary to render it valid and enforceable.

**Section 10.10 Waiver.**

No waiver of any provision of this Agreement shall be deemed effective unless expressly set forth in a written instrument signed by the Person against whom such waiver is to be enforced, and no failure to insist upon strict performance of any particular provision shall preclude any Person having express rights hereunder from thereafter insisting upon strict compliance in the future. A waiver or consent as to any particular default with respect to the Company shall not extend to any other default regarding the same or any other obligation with respect to the Company. Absent compelling proof of intentional ratifications, the failure to complain of any act or to declare a default hereunder, shall not be deemed to constitute a waiver of any remedies or create an estoppel with respect to that default.

**Section 10.11 Further Assurances.**

Subject to this Agreement, each Member shall execute and deliver any additional instruments and perform any additional acts that may be reasonably necessary or appropriate to effectuate this Agreement and the transactions contemplated by it.

**Section 10.12 Remedies; Equitable Relief.**

All remedies provided herein (including the equitable relief provided in this Section), or allowed by law or in equity, shall presumptively be cumulative and not exclusive, and may be exercised concurrently or successively. Each Manager and Member acknowledges that a violation or threatened violation by any Manager or Member of any of the provisions of this Agreement would give rise to immediate and irreparable injury to the Company and/or other parties, for which monetary damages will not be an adequate remedy. Accordingly, each party hereto agrees that upon his/her/its breach of this Agreement, each other party shall, in addition to all other remedies that may be available, be entitled to immediate injunctive relief, including a temporary restraining order, a temporary injunction, a permanent injunction, specific performance, or other equitable relief against such breach from any court of competent jurisdiction, without the necessity of posting a bond and without the necessity of showing any actual damages or that money damages would not afford an adequate remedy.

**Section 10.13 Attorneys' Fees.**

In any litigation among the Members or Managers or between any one or more Members or Managers and the Company, the substantially prevailing party shall be entitled to recover its costs, including reasonable attorneys' fees, expert fees, deposition costs, and other expenses associated with the proceedings.

**Section 10.14 Mediation Requirement**.

In the event of any dispute among any parties to this Agreement with respect to (a) this Agreement, (b) the Certificate, or (c) the Company's Purpose, business, management or operations, the interested parties shall first seek to mediate same before an impartial mediator, and the expense of such proceeding shall be shared equally among the mediating parties. If the parties are unable to agree upon a mediator or time and date for the mediation, either party may apply to the district courts of Montgomery County to decide the disagreement. Such mediation is a prerequisite to filing a lawsuit.

IN WITNESS WHEREOF, the undersigned Manager(s) and Member(s) have duly executed this Agreement as of the Effective Date.

**MANAGER(S)**:

_________________________

Margo Williams

**MEMBER(S)**:

_________________________

Margo Williams

## SCHEDULE 1

**NAMES, ADDRESSES, AND PERCENTAGE INTERESTS**
**OF MEMBERS AND ASSIGNEES***

| Member Name, Email and Address | Percentage Interest |
| --- | --- |
| Margo Williams<br>2828 Birney Ave<br>Scranton, PA 18505<br>williams.margo.a@gmail.com | 100% |

*As of: January 10, 2023